Nos. 22-3043

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

———————

EMILY SOUSA,

     Plaintiff-Appellant,

v.

AMAZON.COM, INC.; AMAZON.COM SERVICES LLC;
LAWRENCE DORSEY,

     Defendants-Appellees.

———————

On Appeal from the United States District Court
for the District of Delaware
Case No. 1:21-cv-00717

———————

## BRIEF OF THE U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION AS AMICUS CURIAE IN SUPPORT OF APPELLANT SOUSA AND IN FAVOR OF REVERSAL

———————

GWENDOLYN YOUNG REAMS
*Acting General Counsel*

JENNIFER S. GOLDSTEIN
*Associate General Counsel*

ANNE NOEL OCCHIALINO
*Assistant General Counsel*

GEORGINA C. YEOMANS
*Appellate Attorney*
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. NE, Fifth Floor
Washington, DC 20507
(202) 921-2748
georgina.yeomans@eeoc.gov

# Table of Contents

Table of Authorities....................................................................... iii

Statement of Interest ................................................................ 1

Statement of the Issues............................................................. 2

Statement of the Case ............................................................... 3

I. Factual Background............................................................... 3

II. District Court Decision....................................................... 11

Argument................................................................................ 14

I. The district court erred when it dismissed Sousa's sex-based   hostile work environment claim. ........................................... 14

    A. Sousa plausibly pled a sex-based hostile work environment. ..15

    B. The district court's contrary holding was based on three errors. ...................................................................................... 17

II. The district court erred when it held that Sousa's temporary transfer to New Jersey did not plausibly alter the terms, conditions, or privileges of her employment................................................... 23

    A. Sousa's temporary transfer was an adverse employment action under this Court's precedent......................................... 23

    B. Title VII's plain text does not require a "serious and tangible" adverse action to state a disparate treatment claim.................... 27

III. The district court erred when it held that Sousa's temporary transfer to New Jersey would not deter a reasonable employee from complaining about discrimination. ........................................ 29

Conclusion ............................................................................. 33

Certificate of Compliance....................................................... 34

Certificate of Service .............................................................. 36

# Table of Authorities

## Cases

*Andrews v. City of Phila.*,
  895 F.2d 1469 (3d Cir. 1990) ............................................................. 18

*Barnes v. Nationwide Mut. Ins. Co.*,
  598 F. App'x 86 (3d Cir. 2015) ................................................... 24, 27

*Brady v. Wal-Mart Stores, Inc.*,
  531 F.3d 127 (2d Cir. 2008) ............................................................. 26

*Burlington N. & Santa Fe Ry. Co. v. White*,
  548 U.S. 53 (2006) ..................................................................... *passim*

*Caprio v. Peters*,
  345 F. App'x 824 (3d Cir. 2009) ................................................. 25, 26

*Castleberry v. STI Grp.*,
  863 F.3d 259 (3d Cir. 2017) ....................................................... 15, 22

*Chambers v. District of Columbia*,
  35 F.4th 870 (D.C. Cir. 2022) (en banc) .......................................... 28

*Clegg v. Falcon Plastics, Inc.*,
  174 F. App'x 18 (3d Cir. 2006) ........................................................ 21

*Connelly v. Lane Constr. Corp.*,
  809 F.3d 780 (3d Cir. 2016) ................................................... 3, 20, 26

*Davis v. Legal Servs. Ala., Inc.*,
  143 S. Ct. 560 (2023) (mem) ........................................................... 29

*Dennison v. Indiana Univ. of Pa.*,
  No. 22-2649 (3d Cir. Jan. 25, 2023) ................................................ 27

*Durham Life Ins. Co. v. Evans*,
  166 F.3d 139 (3d Cir. 1999) ................................................. 15, 16, 18

*EEOC v. Costco Wholesale Corp.,*
903 F.3d 618 (7th Cir. 2018) ................................................................ 18

*EEOC v. Nat'l Educ. Ass'n, Alaska,*
422 F.3d 840 (9th Cir. 2005) ................................................................ 19

*Hall v. Gus Constr. Co.,*
842 F.2d 1010 (8th Cir. 1988) ............................................................ 18

*Hamilton v. Dallas Cnty.,*
42 F.4th 550 (5th Cir. 2022) ................................................................ 28

*Hampton v. Borough of Tinton Falls Police Dep't,*
98 F.3d 107 (3d Cir. 1996) .................................................................. 32

*Harris v. Forklift Sys., Inc.,*
510 U.S. 17 (1993) ....................................................... 15, 17, 21, 22

*Jones v. Se. Pa. Transp. Auth.,*
796 F.3d 323 (3d Cir. 2015) ..................................................... 23, 24, 27

*Komis v. Sec'y of U.S. Dep't of Lab.,*
918 F.3d 289 (3d Cir. 2019) ................................................................ 30

*Langley v. Merck & Co., Inc.,*
186 F. App'x 258 (3d Cir. 2006) ......................................................... 25

*Lehmann v. Toys R Us, Inc.,*
626 A.2d 445 (N.J. 1993) .................................................................... 23

*Meritor Sav. Bank, FSB v. Vinson,*
477 U.S. 57 (1986) .............................................................................. 22

*Moody v. Atl. City Bd. of Educ.,*
870 F.3d 206 (3d Cir. 2017) ......................................................... 22, 23

*Moore v. City of Phila.,*
461 F.3d 331 (3d Cir. 2006) ................................................................ 32

*Muldrow v. City of St. Louis,*
143 S. Ct. 560 (2023) (mem) .............................................................. 29

*Oncale v. Sundowner Offshore Servs., Inc.,*
  523 U.S. 75 (1998) ........................................................ 15, 18

*Peterson v. Linear Controls, Inc.,*
  140 S. Ct. 2841 (2020) (mem) ............................................ 27

*Rosario v. Dep't of Army,*
  607 F.3d 241 (1st Cir. 2010) ............................................. 19

*Starnes v. Butler Cnty. Ct. of Common Pleas,*
  971 F.3d 416 (3d Cir. 2020) ............................................. 22

*Threat v. City of Cleveland,*
  6 F.4th 672 (6th Cir. 2021) ............................................. 28

*Torre v. Casio, Inc.,*
  42 F.3d 825 (3d Cir. 1994) ........................................... 24, 25

*Waldo v. Consumers Energy Co.,*
  726 F.3d 802 (6th Cir. 2013) ............................................ 18

*Williams v. Gen. Motors Corp.,*
  187 F.3d 553 (6th Cir. 1999) ............................................ 19

*Zelinski v. Pa. State Police,*
  108 F. App'x 700 (3d Cir. 2004) ........................................ 25

## Statutes

42 U.S.C. § 2000e-2(a)(1) ................................... 1, 23, 26-27

42 U.S.C. § 2000e-3(a) ..................................................... 2

## Other Authorities

Civil Rights Act of 1991, Pub L. No. 102-166,

105 Stat. 1072 ............................................................ 18

29 C.F.R. § 1604.11(a) .................................................... 21

Federal Rule of Appellate Procedure 29(a) ................................. 2

iv

Federal Rule of Civil Procedure 12(b)(6) ............................................... 11

**Statement of Interest**

Congress charged the Equal Employment Opportunity
Commission (EEOC) with administering and enforcing Title VII of the
Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. In this sex
discrimination and retaliation case, the district court dismissed
Plaintiff Emily Sousa's sex-based hostile work environment claim on
the ground that harassing conduct must be sexual in nature and
equally egregious as other cases of harassment to be actionable. The
court also held that Sousa's temporary transfer from Delaware to New
Jersey to perform manual labor three levels below her supervisory
status, interfering with her promotion prospects, changing her shift
from day to night, and doubling her commute time, could not plausibly
constitute disparate treatment because it did not sufficiently alter her
terms, conditions, or privileges of employment under 42 U.S.C. § 2000e-
2(a)(1). Finally, without applying the Supreme Court's decision in
*Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53
(2006), the district court held that this same transfer was not
materially adverse and therefore could not plausibly constitute

retaliation under 42 U.S.C. § 2000e-3(a). Each of these rulings is grounded in legal error.

The EEOC has a substantial interest in the proper interpretation of Title VII. It files this brief pursuant to Federal Rule of Appellate Procedure 29(a).

## Statement of the Issues[1]

1.    Has Sousa alleged facts giving rise to a plausible inference that she endured a sex-based hostile work environment while working at Amazon?

2.    Did Sousa's temporary transfer from her daytime supervisory position in Delaware to an overnight position performing manual labor in New Jersey sufficiently alter the terms, conditions, or privileges of her employment to be actionable under Title VII's disparate treatment provision?

3.    Was Sousa's temporary transfer from her daytime supervisory position in Delaware to an overnight position performing manual labor in New Jersey materially adverse, as would be required to plausibly state a Title VII retaliation claim under

---

[1] EEOC takes no position on any other issue in the case.

*Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006)?

## Statement of the Case

## I. Factual Background

We recite the facts as alleged in the plaintiff's 52-page Second Amended Complaint (SAC), drawing all permissible inferences in her favor. *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016).

Emily Sousa, a Japanese-American woman, was hired as a Level 4 manager at Amazon[2] directly out of college. Appx.75 ¶¶ 34, 36-37. She was overjoyed to work for a company she had long admired. Appx.67 ¶ 2. Sousa began her in-person training at a Pennsylvania location in July 2020 but resigned shortly thereafter because a manager told her that "women are too delicate to work at Amazon," and compared her to an adult film actress. Appx.75-76 ¶¶ 37-43. After Sousa resigned, Amazon offered to reinstate her and move her to Amazon's New Castle, Delaware location. Sousa agreed and started work in Delaware on

---

[2] We adopt the SAC's terminology and refer to Defendants Amazon.com, Inc. and Amazon.com Services LLC collectively as "Amazon."

August 31.[3] Appx.76 ¶¶ 44-46.

Sousa's manager at the Delaware site, Lawrence Dorsey, immediately began calling Sousa after hours to discuss personal matters. On Sousa's first day at the Delaware location, Dorsey sent Sousa an "unsolicited casual 'selfie'" and followed up with a phone call to ask what Sousa thought of his haircut. Appx.82 ¶ 76. Dorsey called Sousa at least fourteen times between August 31 and early December. Many nights, he kept Sousa on the phone for lengthy phone calls, forcing her to discuss, in addition to his appearance, his love life and Sousa's love life. Appx.77, 81-84, 86-87 ¶¶ 50-51, 75-77, 80-90, 100-101. Dorsey repeatedly suggested that he and Sousa spend time together outside of work, including suggesting that Sousa show him around her alma mater, the University of Delaware, and musing about traveling to Japan with her as his "guide." Appx.84 ¶ 86. Dorsey also stereotyped Sousa based on her race, explaining his belief that Japanese people are "polite and non-confrontational," ascribing those characteristics to

---

[3] Sousa informed Amazon's human resources department about her experience at the Pennsylvania location, but Amazon closed its internal investigation without identifying the perpetrator. Appx.76, 79-81 ¶¶ 40, 60-73.

Sousa, and asking Sousa if she liked anime. Appx.83-84, 93 ¶¶ 84, 133.
And Dorsey "dangle[d] the prospect of promotion" to Sousa during the
calls, "suggest[ing] he had power to ensure that she would get a
promotion and a larger than normal pay increase." Appx.84 ¶ 90. On
one occasion, he offered to help Sousa with a promotion while also
telling her that he was out of town with "'a friend,' seemingly referring
to a romantic assignation." Appx.88 ¶ 108.

Sousa felt "uncomfortable and cornered" by the lengthy after-
hours phone calls and tried, unsuccessfully, to end them in a non-
confrontational manner. Appx.77, 81, 84 ¶¶ 51, 78, 89. For instance,
during one call, Sousa cited the late hour in trying to end the call.
Dorsey did not take the hint, responding, "You could call me in the
middle of the night and I would answer." Appx.82 ¶ 79.

As Sousa was experiencing this unwanted attention from Dorsey,
she learned from other Amazon employees that Dorsey had a reputation
for targeting female subordinates, favoring those who welcomed his
advances and punishing those who did not. Appx.85, 87 ¶¶ 91-93, 95,
105, 114, 124, 128. His behavior led one coworker to "wonder[] whether
Dorsey had an 'Asian fetish.'" Appx.91 ¶ 124. Sousa personally

witnessed Dorsey's disparate treatment of female employees, including when he commented about their appearance in Sousa's presence, and when he directed Sousa to discipline another female employee who had rebuffed Dorsey's advances. Appx.85-86 ¶¶ 95-98.

Sousa also learned of comments that Dorsey had made about her to others. She learned, for instance, that, before she started at the Delaware location, Dorsey saw her picture and said, "She's really pretty, I can't wait to work with her." Appx.78 ¶ 55. She also learned that Dorsey had gossiped with another Amazon employee about the harassment Sousa experienced in Pennsylvania, claiming Sousa had been compared to an "Asian porn star." The actress in question was not in fact Asian. Dorsey added that detail, which Sousa alleges "demonstrates his fixation on Ms. Sousa's Japanese race, ethnicity, and national origin." Appx.78 ¶ 54.

In November, Sousa learned Dorsey was secretly dating an Amazon subordinate, though Dorsey did not disclose that fact to Sousa. Appx. 88 ¶ 109. Dorsey began asking Sousa for relationship advice (without naming his girlfriend) during his after-hours phone calls. Appx.88-90 ¶ 111. During the workday, Sousa saw Dorsey

professionally favoring his girlfriend, a Level 1 associate, including by giving her a maroon vest that connoted a higher status than other Level 1 associates (who wore yellow vests), indicated a "strong performance," and "ensured" she would be "in line for a promotion to Level 3," despite her well-known performance issues. Appx.89-90 ¶¶ 114-117. At the same time, Dorsey began giving Sousa the cold shoulder, ignoring her work-related messages and refusing to provide her with assistance as her supervisor. Appx.87-88 ¶¶ 103, 104, 110. On a few occasions, Dorsey explained that he was "busy with a friend," which Sousa understood as his attempt to convey that he was punishing her for rebuffing his advances. Appx.88 ¶ 110.

On November 20, Sousa learned that Amazon was temporarily transferring her to one of its New Jersey facilities where she would be performing the duties of a Level 1 associate. Appx.94 ¶ 139. The transfer, while unaccompanied by a salary change or official title change, nonetheless constituted a significant change for the worse for Sousa. She spent her time performing manual labor rather than supervising it, her commute increased so much that Amazon offered to put her up in a hotel, she went from working the day shift to working

7

overnight, and the transfer interfered with her promotion prospects at a crucial time. Appx.97, 100-01 ¶¶ 155, 174-175. According to Sousa, Amazon relies heavily on upward reviews written by "direct reports" (i.e., subordinates) when assessing promotions. It also relies on supervisors' observation of their subordinates' performance during the "peak" holiday season. Stripping Sousa of her direct reports and sending her to a different location immediately before the peak season substantially interfered with her promotion potential, delaying "any prospect of such a promotion for at least the next year." Appx.71, 96, 97-98 ¶¶ 14, 148, 154-155, 158.

The SAC alleges that it was Dorsey's decision to temporarily transfer Sousa, "a Japanese woman who had rebuffed his advances," thereby "deliberately" harming her promotion chances. Appx.96 ¶ 149. When Sousa discussed the upcoming transfer with Dorsey and expressed concerns about what it meant for her future at the company, Dorsey told her she was the "obvious choice" for the temporary transfer, in part because Dorsey did not want to "interfere with the potential promotion" of a male colleague. Appx.96 ¶ 146. That colleague was on roughly the same promotion timeline as Sousa. Appx.96 ¶ 147. Dorsey

admitted the transfer was "humiliating" and "humbl[ing]," and that Sousa would be "an overpaid associate." Appx.95-96, 98 ¶¶ 146, 161. He could provide no real explanation for why someone of a lower level could not be sent instead. Appx.97 ¶¶ 152-153.

After approximately ten days at the New Jersey site, Sousa learned she would return to the Delaware warehouse. Dorsey's conduct had caused Sousa high stress during her time at Amazon. Appx.101-02 ¶¶ 177-183. Specifically, Dorsey's constant harassment caused her "extreme anxiety" that "manifested in physical symptoms," including "a rash, hives, and a ringing in her ears," which worsened significantly after her transfer. Appx.101 ¶ 178-179. Unable to cope with the intense anxiety and her worsening health, she visited her primary care doctor, who referred her to a psychiatrist. Appx.101 ¶ 180. Her psychiatrist prescribed her medication, and she began seeing a therapist, whom she has continued to see monthly. Appx.101 ¶¶ 181-182. Her parents "noted that she seemingly had become a different person for a time." Appx.72 ¶ 17. Sousa therefore announced her intention to resign rather than return to Delaware. Appx.102 ¶ 184.

When Dorsey learned that Sousa intended to resign, he called and asked her to take leave instead. During this call, Dorsey also asked Sousa, "How available are you?"; told Sousa "a friend" was "really into" Sousa; and asked her to "consider" dating this unidentified "friend." Three days later, Dorsey called Sousa, in his capacity as her supervisor, to tell her that she had been approved to go on leave. Dorsey then turned the conversation to Sousa's boyfriend and "her plans with [him] when he returned from the military." Appx.102-03 ¶¶ 185-190.

Sousa took unpaid medical leave starting in December 2020 to cope with the stress and anxiety arising from Dorsey's conduct. In January 2021, she contacted Amazon's HR manager to report Dorsey's behavior. Appx. 103-04 ¶ 194. Sousa's was the second complaint filed against Dorsey by a female Amazon employee. Appx.104 ¶ 196. Amazon concluded its investigation of Dorsey in March and notified Sousa that her claims were "unsubstantiated." Appx.105 ¶ 204. Amazon also denied Sousa's request to be immediately transferred to a different location when her leave ended. Appx.105-06 ¶¶ 206-207.

Within hours of Amazon's completion of its investigation of Dorsey, Sousa received several phone calls from an unidentified

number, in which a caller that sounded like Dorsey made comments like, "Hello, Em. Do you know who this is?" and "You know what I want." The calls, which continued for two days, "paralyzed" Sousa "with fear," left her hypervigilant, and increased her stress to the point that her hair started falling out. They ended only after Sousa's father answered her phone and confronted the caller. Appx.108-10 ¶¶ 219-231.

In July 2021, around the time Amazon promoted Dorsey to Station Manager and while Sousa was still on medical leave, Sousa resigned. Appx.107 ¶¶ 213-214. She could not face returning to work with Dorsey, "physically shaking" at the thought. Appx.105-06 ¶ 207. "Sousa was so desperate to avoid returning to work with Dorsey . . . that she left a $50,000 a year managerial job for a $15 an hour position with a different company." Appx.107 ¶ 215.

## II. District Court Decision

After the district court dismissed her first amended complaint without prejudice under Rule 12(b)(6), Sousa filed the SAC alleging that Amazon violated Title VII when it subjected her to a hostile work environment based on, among other things, sex; discriminated against

her on the same basis; retaliated against her for complaining about discrimination; and engaged in "quid pro quo" sexual harassment.

The district court (Third Circuit Judge Bibas, sitting by designation) dismissed Sousa's SAC with prejudice. First, the district court held that Sousa failed to plead a hostile work environment. It reasoned that Dorsey's phone calls were "inappropriate for a professional relationship," but found they were "not 'sufficiently extreme' to be considered 'severe' harassment." Appx.9. The court relied on its view that Dorsey "never said anything sexual." *Id*. The court then determined that Sousa's other allegations fell short of pleading a hostile work environment "even when combined with the phone calls," because they were "episodic" and therefore not pervasive, and not severe. Appx.10. The court then opined that the post-investigation anonymous phone calls Sousa received were "creepy" and "distressing, [but] they were not sexual," nor were they "'physically threatening,' and they did not even involve a 'mere offensive utterance.'" *Id*. The court reiterated that the totality of Sousa's allegations did not create a hostile work environment. Appx.11.

Turning to Sousa's disparate treatment claim, the court held that, although Sousa pointed to "six events that she thinks count as adverse actions," only Amazon's refusal to transfer Sousa away from the Delaware warehouse in the spring of 2021 "appears to count, and that one fails to give rise to a plausible inference of discrimination." *Id*. The other five "events" that Sousa alleged constituted disparate treatment were not "adverse employment actions" because they were not "serious and tangible enough to alter [her] compensation, terms, conditions, or privileges of employment." *Id*. (quoting *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015)) (alteration in opinion). We focus on Sousa's allegation that her temporary transfer to New Jersey was an adverse employment action. The district court rejected that argument, reasoning that "[a] temporary reassignment to cover a brief staffing shortage is not a 'serious and tangible' adverse action," that Sousa's transfer did not constitute a "demotion," and that her lost promotion potential was not sufficiently adverse to support a discrimination claim. Appx.12-13.

The court then held Sousa did not plead actionable retaliation because, "[a]s I have said, most of her allegations fail to meet the . . .

13

requirement[] that Amazon took an adverse employment action against her." Appx.15. Assuming Amazon's refusal to transfer Sousa upon her return from leave was a materially adverse action, the court said, she failed to show causation. *Id.*

The court held, too, that Sousa did not plead "quid pro quo" sexual harassment because, although Dorsey's phone calls "could be taken as sexual advances" that "came with hints about promotion," Sousa did not allege that "rebuffing Dorsey resulted in a 'significant change' to her employment situation." Appx.16.

## Argument

## I. The district court erred when it dismissed Sousa's sex-based hostile work environment claim.

Sousa plausibly alleged that she experienced a sex-based hostile work environment. In holding otherwise, the district court committed several legal errors. First, the district court incorrectly reasoned that conduct directed as Sousa was not "sexual" and therefore not actionable. Second, in so characterizing Sousa's allegations, the court failed to draw inferences in Sousa's favor. Third, the district court's comparison of Sousa's allegations to cases alleging egregiously severe sexual misconduct set too high a bar for her claim.

14

A. Sousa plausibly pled a sex-based hostile work environment.

To plead a sex-based hostile work environment claim, a plaintiff must plausibly allege that she suffered severe or pervasive intentional discrimination that was based on her sex. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993); *Connelly*, 809 F.3d at 787 (discussing pleading standard). The hostile work environment analysis considers "the totality of the circumstances, including: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017) (quoting *Harris*, 510 U.S. at 23). A plaintiff must also plead a basis for employer liability. *Id*. at 263. Here, the district court dismissed Sousa's claim based on its view that she did not plausibly plead that she experienced severe or pervasive harassment based on sex.

Unlawful harassment based on sex can take different forms, including harassment that is "sexual in nature" as well as harassment that is non-sexual, but nonetheless occurs because of the plaintiff's sex. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998);

*Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 148 (3d Cir. 1999) (conduct creating hostile environment can be "non-sexual but gender-based"). When a plaintiff experiences multiple forms of sex-based harassment, the court should consider the totality of the conduct based on sex to decide whether the plaintiff has suffered a hostile work environment. *See Durham Life Ins.*, 166 F.3d at 148-49.

Under these established principles, Sousa pled a sex-based hostile work environment. She alleged a regular pattern of unwelcome and highly personal phone calls from her supervisor that she felt, based on Dorsey's representations and reputation, that she could not resist without incurring professional consequences. Dorsey dangled the prospect of helping Sousa with a promotion, but did so during these inappropriate phone calls and, at least on one occasion, did so while on a getaway with a "friend," which Sousa took to refer to a "romantic assignation." When Sousa failed to respond in a manner that Dorsey thought sufficiently welcoming, he ostracized her at work, interfering with her ability to get her job done, and then orchestrated an objectively undesirable and, in his own words, "humiliating" temporary transfer that delayed her promotion potential by at least a year. Conversely,

when another Amazon associated started dating Dorsey, Dorsey paved the way for that associate's imminent promotion, despite her well-known performance issues. When Sousa complained to human resources about Dorsey's conduct, someone who sounded like Dorsey called Sousa repeatedly in an intimidating and suggestive manner. *See supra* 3-11. These facts plausibly allege a course of intentional discrimination based on Sousa's sex that was humiliating, interfered with Sousa's ability to do her job, and intimidated her on an ongoing basis for approximately seven months. *See Harris*, 510 U.S. at 23.

B. The district court's contrary holding was based on three errors.

The district court reached the opposite conclusion. It dismissed Dorsey's phone calls as insufficiently "severe" to create a hostile work environment, largely because "he never said anything sexual." Appx.9. And it discounted the anonymous phone calls as "creepy" and "distressing," but, again, "not sexual," not "physically threatening," "not even involv[ing] a 'mere offensive utterance,'" and therefore not sufficient to constitute harassment, even considered along with Dorsey's phone calls and other actions, as well as other comments made by

Sousa's coworkers. Appx.10-11. The court's analysis was infected by three distinct errors.

The district court first failed to consider that, even if not sexual in nature, Dorsey's conduct could nonetheless create a hostile work environment. "Intimidation and hostility toward women because they are women can obviously result from conduct other than explicit sexual advances." *Andrews v. City of Phila.*, 895 F.2d 1469, 1485 (3d Cir. 1990), *superseded in part on other grounds by* Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1072 (quoting *Hall v. Gus Constr. Co.*, 842 F.2d 1010, 1014 (8th Cir. 1988)). Title VII thus prohibits sex discrimination regardless of whether that discrimination takes an explicitly sexual form. *See Oncale*, 523 U.S. at 80 ("[H]arassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex."); *Durham Life Ins.*, 166 F.3d at 148 (Title VII applies to a range of sex-based conduct, not just conduct that is explicitly "sexual"); *see also EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 626 (7th Cir. 2018) (Barrett, J.) (harassment "because of sex" "need not consist of pressure for sex, intimate touching, or a barrage of deeply offensive sexual comments"); *Waldo v. Consumers Energy Co.*, 726 F.3d

802, 815 (6th Cir. 2013) ("[N]on-sexual conduct may be illegally sex-based where it evinces anti-female animus[.]" (quoting *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999)); *Rosario v. Dep't of Army*, 607 F.3d 241, 248 (1st Cir. 2010) (same); *EEOC v. Nat'l Educ. Ass'n, Alaska*, 422 F.3d 840, 845 (9th Cir. 2005) (holding a "pattern of abuse in the workplace directed at women, whether or not it is motivated by 'lust' or by a desire to drive women out of the organization, can violate Title VII").

Sousa alleged that she experienced a hostile work environment based on "unwelcome sexual advances and other inappropriate and offensive conduct on the basis of and/or which she was subject to because of her protected characteristics." Appx.112-13 ¶ 247. Sousa supported that allegation with detailed facts describing how Dorsey repeatedly called her after hours and kept her on the phone for lengthy phone calls that had nothing to do with work. When she was unreceptive to those phone calls, Dorsey gave her the cold shoulder at work, making it difficult to do her job, and prompted her humiliating transfer to the New Jersey facility. She also alleged that Dorsey had engaged in similar behavior in the past, with only female subordinates.

19

*See supra* 4-11. She thus plausibly alleged that his treatment was because of her sex, whether or not it was overtly sexual in nature. The district court erred when it failed to evaluate whether this treatment, even if not sexually explicit, constituted discrimination.

Second, as the district court acknowledged later in its opinion, Dorsey's phone calls "could be taken as sexual advances." Appx.16. On a motion to dismiss, if allegations "could be taken" in a way that would favor the plaintiff, that is how they should be taken. *See Connelly*, 809 F.3d at 787, 790 (stating courts must construe factual allegations as true and "in the light most favorable to the plaintiff, and then draw all reasonable inferences from them"). Here, the SAC easily supports an inference that Dorsey's conduct was sexual in nature, comprising sexual innuendos and propositions. Dorsey, who had called Sousa "pretty" before ever meeting her, and later (inaccurately) gossiped that Sousa had been compared to an Asian porn star, regularly asked Sousa about her romantic life and about her boyfriend, asked Sousa for advice about his own romantic life, and told Sousa he would answer the phone for her in the middle of the night. He asked her to spend time with him outside of work, and his phone calls culminated in him pleading with Sousa to

20

consider dating Dorsey's "friend." *See supra* 4-11. The "anonymous" phone calls that Sousa received after Amazon completed its investigation into Dorsey could likewise be considered sexual, given that, at times, the calls consisted only of "heavy breathing," Appx.109 ¶ 225, and during one call the caller said, "You know what I want," Appx.109 ¶ 226.

Once the inference that Dorsey's phone calls "could be taken as sexual advances" is drawn, Dorsey's facially neutral conduct of ignoring Sousa at work, despite being her supervisor, could be considered sex based as well because he was acting on his anger with her refusal to acquiesce to his advances. *See Clegg v. Falcon Plastics, Inc.*, 174 F. App'x 18, 25 (3d Cir. 2006) (a jury could find that facially neutral conduct was motivated by "anger at [plaintiff] for rebuffing" supervisor's advances); *see also* 29 C.F.R. § 1604.11(a) (defining "[u]nwelcome sexual advances" that "unreasonably interfere[e] with an individual's work performance or create[e] an intimidating, hostile, or offensive working environment" as sexual harassment); *and see Harris*, 510 U.S. at 19, 23 (remanding for further consideration of whether workplace harassment,

including "sexual innuendos" from supervisor, constituted a hostile work environment).

Third, the district court erred when it relied on a comparison to two cases regarding allegations of egregious abuse to hold that Sousa's allegations were "not 'sufficiently extreme' to be considered 'severe' harassment or discrimination." Appx.9-10. The court cited two cases, both of which included forced sexual intimacy. *See Starnes v. Butler Cnty. Ct. of Common Pleas*, 971 F.3d 416, 428 (3d Cir. 2020); *Moody v. Atl. City Bd. of Ed.*, 870 F.3d 206, 215 (3d Cir. 2017). These cases of extreme conduct are not the standard against which courts should judge whether workplace harassment is severe or pervasive. *See Harris*, 510 U.S. at 22 ("appalling conduct" in *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986) did not "mark the boundary of what is actionable"). To the extent the district court used these cases as the benchmark for a hostile work environment, it committed reversible error. Moreover, in making this comparison, the court seemingly focused on severity to the exclusion of pervasiveness. *See* Appx.9 ("Although these topics appear inappropriate for a professional relationship, they are not 'sufficiently extreme' to be considered 'severe' harassment or discrimination."). Of

course, a hostile work environment is made up of conduct that is severe

*or* pervasive; a lack of severity alone is not dispositive. *Harris*, 510 U.S.

at 21; *see also Castleberry*, 863 F.3d at 264 ("'[S]everity' and

'pervasiveness' are alternative possibilities: some harassment may be

severe enough to contaminate an environment even if not pervasive;

other, less objectionable, conduct will contaminate the workplace only if

it is pervasive."). Indeed, "the required showing of severity or

seriousness of the harassing conduct varies inversely with the

pervasiveness or frequency of the conduct." *Moody*, 870 F.3d at 214 n.12

(quoting *Lehmann v. Toys R Us, Inc.*, 626 A.2d 445, 455 (N.J. 1993)).

## II. The district court erred when it held that Sousa's temporary transfer to New Jersey did not plausibly alter the terms, conditions, or privileges of her employment.

The district court's holding that Sousa's temporary transfer did

not alter her terms, conditions, or privileges of employment was error.

This Court has consistently held that transfers like the one Sousa

alleged can violate Title VII.

### A. Sousa's temporary transfer was an adverse employment action under this Court's precedent.

Title VII prohibits discrimination "against any individual with

23

respect to . . . terms, conditions, or privileges of employment, because

of" a protected characteristic. 42 U.S.C. § 2000e-2(a)(1). This Court

requires a Title VII plaintiff alleging disparate treatment

discrimination to "prove that she suffered an adverse employment

action in order to satisfy step one of *McDonnell Douglas*." *Jones v. Se.*

*Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015). This Court's

precedent defines an "adverse employment action" as "an action by an

employer that is serious and tangible enough to alter an employee's

compensation, terms, conditions, or privileges of employment." *Id.*

(quotation marks omitted). "[A]ctions that reduce opportunities for

promotion or professional growth can constitute adverse employment

actions." *Barnes v. Nationwide Mut. Ins. Co.*, 598 F. App'x 86, 90 (3d

Cir. 2015). And "a transfer, even without loss of pay or benefits, may, in

some circumstances, constitute an adverse job action." *Torre v. Casio,*

*Inc.*, 42 F.3d 825, 831 n.7 (3d Cir. 1994).

Sousa alleged that Dorsey temporarily transferred her from

performing Level 4 supervisory functions to performing Level 1 manual

labor, which Dorsey described as "humiliating"; that her transfer

significantly lengthened her commute; that she went from working the

day shift to working overnight; and that her transfer impeded her opportunities for promotion. *See supra* 7-9. These allegations suffice to plead an adverse employment action under this Court's precedent, which recognizes that transfers that do not affect pay or title can nonetheless be sufficiently serious and tangible to alter an employee's terms, conditions, or privileges of employment. *See Jones*, 198 F.3d at 411-12 (administrative transfers that impeded teacher's ability to teach desired subjects and placed him in a "difficult school" sufficed to defeat summary judgment on discrimination claim); *Torre*, 42 F.3d at 831 n.7 (transfer to a position that jury could find was a dead-end job, even without loss of pay or benefits, could constitute "adverse job action" for ADEA claim); *Caprio v. Peters*, 345 F. App'x 824, 827 (3d Cir. 2009) (transfer resulting in "substantial modification" of job responsibilities and increased commute time was "discrete adverse action" for Rehabilitation Act claim); *Langley v. Merck & Co., Inc.*, 186 F. App'x 258, 261 (3d Cir. 2006) (evidence that a plaintiff was transferred to an "inferior" position could support a discrimination claim); *Zelinski v. Pa. State Police*, 108 F. App'x 700, 705 (3d Cir. 2004) (transfer to patrol

unit, even unaccompanied by loss of pay or rank, "was an 'adverse employment action' under Title VII").

The district court's contrary holding, which focused on the temporary nature of the transfer, was error. First, the district court cited no case law for the proposition that temporary transfers cannot be adverse, and there is case law suggesting the opposite. *See, e.g.*, *Caprio*, 345 F. App'x at 827 (one-month transfer was discrete discriminatory act triggering limitations period for Rehabilitation Act claim); *see also Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008) ("We cannot agree with Appellants that the short duration of Appellee's transfer to the parking [lot] is a proper basis for finding, as a matter of law, that there no adverse employment action occurred.").

Second, the district court failed to accept as true Sousa's allegations that the transfer harmed her opportunities for advancement. The district court's assessment that Sousa's transfer was not serious and tangible because her "reassignment was for a fraction of the peak season, and she would have been evaluated on at least nine months of managerial work" was based on inferences erroneously drawn against Sousa. *See Connelly*, 809 F.3d at 790 (reviewing court

must "assume . . . factual allegations to be true, construe those truths in the light most favorable to the plaintiff, and then draw all reasonable inferences from them").

Sousa alleged that the transfer would delay her promotion potential for at least a year because she was away from her reviewers during the company's most crucial time of the year. Dorsey himself implicitly acknowledged this effect when he explained that he was transferring Sousa rather than a similarly situated employee to avoid interfering with the other employee's promotion potential. When taken as true, these allegations plausibly allege that Sousa suffered an adverse employment action. *See Barnes*, 598 F. App'x at 90 ("[A]ctions that reduce opportunities for promotion or professional growth can constitute adverse employment actions.").

B. Title VII's plain text does not require a "serious and tangible" adverse action to state a disparate treatment claim.

Although this Court need not reach the issue because Sousa's temporary transfer meets this Court's requirement that an "adverse employment action" be "serious and tangible," *Jones*, 796 F.3d at 326,

we note that, in the view of the EEOC and the Attorney General,[4] this standard is incorrect and constitutes an atextual judicial gloss on Title VII's plain language.

The statute prohibits "discriminat[ion] . . . with respect to . . . compensation, terms, conditions, or privileges of employment," 42 U.S.C. § 2000e-2(a)(1), without any additional requirement of a "serious and tangible" interference. Two courts of appeals have explicitly adopted standards aligned with the government's position. *See Chambers v. District of Columbia*, 35 F.4th 870, 872-73 (D.C. Cir. 2022) (en banc); *Threat v. City of Cleveland*, 6 F.4th 672, 678 (6th Cir. 2021). The Fifth Circuit is currently considering whether to overrule its precedent requiring plaintiffs to make a heightened showing that they were discriminated against with respect to an "ultimate employment decision." *Hamilton v. Dallas Cnty.*, 42 F.4th 550, 555 (5th Cir.), *reh'g en banc granted, opinion vacated,* 50 F.4th 1216 (5th Cir. 2022). The

---

[4] *See, e.g.*, En Banc Br. of the United States and EEOC as Amicus Curiae, *Hamilton v. Dallas Cnty.*, No. 21-10133 (5th Cir. Nov. 21, 2022), 2022 WL 17370136; Br. for the United States as Amicus Curiae at 15-17, *Peterson v. Linear Controls, Inc.*, 140 S. Ct. 2841 (2020) (No. 18-1401), 2020 WL 1433451; *cf.* Brief of the EEOC as Amicus Curiae *Dennison v. Indiana Univ. of Pa.*, No. 22-2649 (3d Cir. Jan. 25, 2023).

28

scope of Title VII's coverage is also currently pending before the Supreme Court, which recently asked for the Solicitor General's views on the issue. *See Davis v. Legal Servs. Ala., Inc.*, No. 22-231, 143 S. Ct. 560 (Jan. 9, 2023) (mem); *Muldrow v. City of St. Louis*, No. 22-193, 143 S. Ct. 560 (Jan. 9, 2023) (mem).

We bring these developments to the Court's attention so that it can consider revisiting its requirement that plaintiffs plead and then demonstrate a "serious and tangible" "adverse employment action" in an appropriate case. But because Sousa's temporary transfer is a sufficiently adverse employment action under the Court's current standard, the Court need not do so here.

## III. The district court erred when it held that Sousa's temporary transfer to New Jersey would not deter a reasonable employee from complaining about discrimination.

The district court applied the disparate treatment standard, discussed in section II, rather than the Supreme Court's retaliation standard, to Sousa's retaliation claim. Relying on this inapposite standard, the court incorrectly held that Sousa's temporary transfer was not sufficiently adverse to constitute a retaliatory act.

In *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), the Supreme Court established that Title VII's antiretaliation provision protects employees from retaliation that "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 67-68. It is a distinct standard from Title VII's disparate treatment standard, discussed supra at section II, and therefore is not limited to adverse employment actions. *Id.* at 64, 67; *see also Komis v. Sec'y of U.S. Dep't of Lab.*, 918 F.3d 289, 293 (3d Cir. 2019) ("[T]he antiretaliation provision is not limited to employer action that affects the terms and conditions of a claimant's employment.").

The district court failed to apply the appropriate standard when it dismissed Sousa's retaliation claim. The district court did not cite *Burlington Northern* or acknowledge that Title VII's disparate treatment provision and the retaliation provision are "not conterminous." *Burlington N.*, 548 U.S. at 67. Instead, it relied on its earlier disparate treatment analysis to again hold that "most of [Sousa's] allegations fail to meet the [] requirement . . . that Amazon took an adverse employment action against her." Appx.15. The district

30

court's failure to separately assess whether Sousa alleged an act by Amazon that "could well dissuade a reasonable worker from making or supporting a charge of discrimination," *Burlington N.*, 548 U.S. at 57, was error.

Applying the appropriate standard and viewing all factual inferences in her favor, Sousa plausibly alleged retaliation that might well dissuade a reasonable worker from complaining about discrimination. She alleged that Amazon retaliated against her by involuntarily transferring her from Delaware to New Jersey to perform manual labor three levels below her designation, resulting in a doubling of her commute time, switching her schedule from days to nights, and delaying her prospects for promotion. *See supra* at 7-9. This fact pattern is analogous to *Burlington Northern*, wherein the Court held that a jury could find reassignment from the prestigious forklift operator position to a more arduous and dirtier track laborer role materially adverse to a reasonable employee. 548 U.S. at 70-71 ("Common sense suggests that one good way to discourage an employee . . . from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those

31

that are easier or more agreeable."); *Moore v. City of Phila.*, 461 F.3d 331, 348 (3d Cir. 2006) (applying *Burlington Northern* to conclude that transfer to less desirable assignment was "materially adverse"). Indeed, even this Court's pre-*Burlington Northern* precedent recognized that a reassignment to a less desirable position could be actionable under Title VII's anti-retaliation provision. *See Hampton v. Borough of Tinton Falls Police Dep't*, 98 F.3d 107, 116 (3d Cir. 1996) (jury could find transfer to less desirable assignment, even though labeled as temporary and not affecting pay or rank, retaliatory).

Moreover, as in the disparate treatment context, the temporary nature of the transfer does not render it immaterial. A reasonable worker may well be dissuaded from complaining about discrimination if, each time she did, she was transferred for ten days from a supervisory position to perform manual labor, her commute doubled, her shift flipped from day to night, and her promotion prospects were delayed a full year.

## Conclusion

For the foregoing reasons, the EEOC respectfully requests that the Court reverse the dismissal of Sousa's SAC and remand to the district court for further proceedings.

Respectfully submitted,

GWENDOLYN YOUNG REAMS
Acting General Counsel

JENNIFER S. GOLDSTEIN
Associate General Counsel

ANNE NOEL OCCHIALINO
Assistant General Counsel

*/s/ Georgina C. Yeomans*
GEORGINA C. YEOMANS
D.C. Bar No. 1510777
Appellate Attorney
Office of General Counsel
Equal Employment Opportunity
Commission
131 M St. NE, Fifth Floor
Washington, DC 20507
(202) 921-2748
georgina.yeomans@eeoc.gov

## Certificate of Compliance

Pursuant to 3d Cir. L.A.R. 28.3(d) & 46.1(e), I certify that, as an attorney representing an agency of the United States, I am not required to be admitted to the bar of this Court. *See* 3d Cir. L.A.R. 28.3, comm. cmt. I also certify that all other attorneys whose names appear on this brief likewise represent an agency of the United States and are also not required to be admitted to the bar of this Court. *See id.*

I certify that this brief complies with the type-volume limit of Federal Rules of Appellate Procedure 29(a) and 32(a)(7)(B)(i) because it contains 6,157 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and 3d Cir. L.A.R. 29.1(b). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word for Office 365 ProPlus in Century Schoolbook 14-point font, a proportionally spaced typeface.

Pursuant to 3d Cir. L.A.R. 31.1(c), I certify that the text of the electronically filed version of this brief is identical to the text of the hard copies of the brief that will be filed with the Court. I further certify pursuant to 3d Cir. L.A.R. 31.1(c) that, prior to electronic filing with

this Court, I performed a virus check on the electronic version of this

brief using Trend Micro Office Scan, version 14.0.8515, and that no

virus was detected.


/s Georgina C. Yeomans
GEORGINA C. YEOMANS

## Certificate of Service

On March 31, 2023, I filed the foregoing brief with the Clerk of the Court by using the CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

*/s Georgina C. Yeomans*
GEORGINA C. YEOMANS